Good morning, your honors, and may it please the court. I'm David Becker on behalf of petitioners Friends of the Columbia Gorge and Save Our Scenic Area. With me at council table is Nathan Baker, staff attorney for Friends of the Columbia Gorge. I'm going to reserve five minutes of my time for rebuttal. This court has recognized that renewable energy projects can have serious environmental impacts, and nowhere is this more true than in the Columbia River Gorge, where the turbines of the Whistling Ridge Wind Project would tower above the ridge lines in the heart of this unique federally protected national scenic area and be the first industrial scale wind facility in a forested habitat anywhere in the Pacific Northwest. I'd like to focus on two ways in which the Bonneville Power Administration's NEPA analysis precluded informed public participation and informed decision making by not evaluating a reasonable range of alternatives. Let's stop for a second, because I think the primary issue in this case for me is whether or not this is the Bonneville Power Authority engaged in a federal action, if you will. I must say that if it did, I think there are some problems with its NEPA analysis. But the primary question is whether or not this is a federal action, at least a seminal question, because we don't get to the NEPA analysis if it's not. And the power authority determined that it was not a federal action and therefore didn't need NEPA compliance. How do we review that determination? I think looking at the EIS itself, the Bonneville Power Administration is the lead federal agency, and it defined the proposed action, the turbines, the federal substation, the federal... I don't think the EIS solves this for us. The EIS is pretty clearly...there is a federal action here, after all. They think the federal action is the interconnection, not the entire project, and they do an EIS with respect to that, and the state component does an EIS with respect to what they're doing. So my question is, when the Bonneville Power Authority says we don't think the entire project is an EIS, is a federal action, and therefore doesn't need an EIS, why is that? I think we review that determination under an arbitrary and capricious standard. Why is that wrong? Because on the face of the EIS, that's what they do. I know, but you keep going. You're going back to the original EIS. The original EIS doesn't say the entire proceeding is a federal action. They would have had to file an EIS simply to do the interconnection, correct? That's true, Your Honor. And so now the question is, you're attempting to say it's a federal action because these two things are interconnected is the wrong word, but you're attempting to say the whole project is a federal action as opposed to simply the interconnection done by BPA. Their primary argument, it may be wrong, but I want to hear why, is that no, all we have to file an EIS for is the interconnection, not for whatever damage may occur to the environment from the purely private or state actions of the, whatever it's called, the whistler, I call it the wind farm, okay, so tell me why the entire project is a federal action as opposed to just the interconnection. Based on, and I was going to ask you the same question, so I want you to answer my question as well, based on an arbitrary and capricious deferential standard of review. Let me first answer that question just very briefly and then that'll... I mean, I think it blends into... It does. It doesn't matter what you say here, you've got to suggest that it's then arbitrary and capricious not to do what you're suggesting. Arbitrary, capricious, or not otherwise in accordance with law, and there are regulatory requirements here that make this a, that make the federal and private portions of this a single action. The question boils down to what Your Honor addressed in the Imperial County air pollution control case, whether there's independent utility of the wind turbines and the federal substation and the interconnection. That's one of the factors, but here we have, let me just sort of walk through it, the state side of it, if you will, the wind farm, there's no federal funding. That's right. No federal grants, no federal supervision. That's right. You agree that if it weren't interconnecting to the BPA power grid, it would not have a requirement to file a federal EIS? Yes, but that's not feasible. Okay, I'm just, all hypotheticals are not this case. You, so it is the act of interconnection here that you think requires that a federal EIS be filed, correct? And this Court has said as much in a similar case, the Port of Astoria v. Hodel case. It's an old case involving the Bonneville Power Administration. It's at 595 F. 2nd, 467 at 477, this Court case from 1979. And in that case, the Court held that BPA had to prepare an EIS for a private aluminum plant because BPA had contracted to provide the transmission for that plant. And this Court said that BPA shares the responsibility for the environmental effects of the private development. And so that case, that case then is supplemented by the Court's jurisprudence on independent utility and the obligation under the scope of an EIS, the regulations at 40 CFR 1508.25 that say that when you have a project where the actions cannot proceed under the jurisdiction of the EIS, or are interdependent parts of a larger action, they must be considered in the same EIS. So it's a matter of, and of course the NEPA, once a project is connected like that, as the wind turbines and the federal substation, federal interconnection are in this case, and where the EIS itself defined this as all part of a single proposed action, once that is required, and this happens all the time, it happened in the case of the Oregon Natural Desert Association v. Jewell that Judge Fisher was familiar with, where the private land turbine site had to be evaluated in the context of the federal transmission line that was being set up there. And once there is this obligation, and the Court's review is of what the agency actually did in the EIS, and they purported to evaluate the turbines and the transmission line together. But now you're back to the adequacy of the EIS. And, you know, I must say on that part of the case, if one is required, I want to hear from your opponents, but I think you've got a fairly strong argument that the EIS doesn't completely comply with NEPA. My question, if it's one project, I don't think there's any doubt here if the EIS merely deals with the environmental effects of the interconnection, take it alone, it's perfectly adequate. And so I'm still struggling with this notion that it becomes, whenever you hook up to a federal utility line, the whole project becomes federal. So tell me, again, walk me through what there is here other than the mere fact that, other than the fact that the project, it would be more difficult for the project to operate if they couldn't get Bonneville's grid, they'd have to get it on somebody else's. What is there that makes this a federal action other than that? Let me first say, there is no way that this project would happen. It's been six years since the site started. Well, but it's happened. So let's assume, for example, today we enjoined Bonneville from providing power to providing an interconnection to this project. Are you saying that it is inconceivable that the state might not find some other way to provide a connection to this project? On the record in this case, Your Honor, yes, because it's been six years since the site certificate was issued, and there hasn't been any activity whatsoever on this project. There's been no further action before the siting council where the developer has to put in 26 more plans before they can start construction. Well, I know. That's a different issue than whether or not the project could operate independently of a Bonneville Power Authority connection. They may never build them. They may never build the project. It may turn out to be a white elephant or whatever, the correct red herring or whatever the correct animal appellation is here. The question is, is the project so dependent on BPA that it could not possibly be done in the absence? Yes, Your Honor. And in the further excerpts of record at page 29, the only local public utility district does not have the ability to interconnect this project and doesn't have the capacity to transmit 70 megawatts of energy. Well, at the moment. But my question is, my question is, if we said BPA was not available, does that mean the project simply could not go on? Yes. And that is the fact. That's the fact. Assuming that to be the case, is that enough to make the project a Federal project? In other words, if the only practicable way for you to proceed is to hook up to BPA, does that mean that your project is a Federal project? Because that's really all I see here in terms of making it Federal. It doesn't have any Federal money, no Federal planning, went through state planning, and BPA's only role is to hook up to the grid. And so the question is, is that enough to make the whole project Federal simply because it couldn't proceed unless BPA hooked up, hooked them up to the grid? In terms of whether or not an EIS has to be prepared, yes. And your best case on that, you think is, your best case is Astoria? The best, the Port of Astoria case is an important case. There's also a case that was, that this was a Garcinorin case that involved an Army Corps of Engineers permit. And in that case, the Corps admitted that without the permit, it, the project couldn't go forward and it would have to be, it would have to evaluate the entire project. No, I understand. But the question there is whether or not that fact alone is enough. It is. And I'm trying to find a case where that's the, because I think that's the only fact you really have here. The only fact you really have here is the project can't practically move forward without this interconnection. And so I'm asking you, give me a case where that was the only fact that gave rise to a Federal action. The Savar-Cinorin v. Flowers case, 408 F. 3rd, 1113 at 1118, it's a Ninth Circuit case from 2005, held that where the Corps had acknowledged the project wouldn't proceed, if the Corps denied the permit, it had to evaluate the entire project as a single project in the, in the EIS. Well, I know it said that. But the reason I'm asking the question is, and I've read the case, is was that the only fact that led to the conclusion of interconnectedness there? Weren't there other factors in that case? Remember, we've laid out sort of five factors that might, might make an interconnected project a Federal one. And to be sure, this is one of them. But I don't think it was the only one in this Cinorin Desert case, was it? I, I think there were other factors as well in that case, but, but, but, but It may cut in your favor. I'm, I'm asking a very specific question. I'm trying to get, trying to get your help here. So let, don't stop me, because I, I, you may help yourself. Is there a case in which this practical impossibility or impracticality of going forward without the Federal component was sufficient to make the project? There may not be. We may be in uncharted territory. The, the Oregon Natural Desert Association VJULE case is, is directly on point here. Because in that case, the turbines were on private land. And the only way that, that the power could be sent from the turbine site to the, the, the power grid was through a transmission line on Federal land administered by the Bureau of Land Management. And in that case, the fact that the turbine site would not have been able to, as a practical matter, operate, did mean that the turbine site, even though it was private, and the Federal transmission line had to be evaluated in a single EIS. And that, that is enough. And the fact that both in that case and in this case, the agency evaluated these together, and specifically said in this case, at ER 213 and also at ER 202, and then in the record of decision, at ER 3 and at ER 19, that without the Federal interconnection, this project will not go forward. So BPA itself Stop, stop for me on Oregon National Desert. Was the Federal nature of the project at issue in Oregon National Desert? The issue wasn't litigated, no. But again Okay. Okay, good. So again, help me, help me with the case where that issue was litigated. Is there, is there a case that where the Federal nature of the project was litigated, where merely the, merely the fact as a practical matter that the entire project wouldn't go forward? The Port of Astoria v. Hodel case is right, is on point for that, because Give me your site for that again. It's 595 It's not named that, that's what It's, it's 595 F. 2nd 467 at 477 Okay A Ninth Circuit case from 1979. I guess the reason we're asking, and Judge Hurwitz has adequately asked, is that if I look at wetlands, and I think it goes the opposite way for your argument Except in that case, Your Honor, at 222 F. 3rd at 1117 1116, it's 1116 through 1118. So if you look in the middle there at 1117, the, there is a specific holding that not only could the private part of the project go forward, but in fact it was. The Corps hadn't issued the permit yet, and yet the other part, the private part, was already proceeding. That's not the fact here. But it seems to me that in wetlands, we noted the district court's determination, and now I'm reading that the project would not be able to proceed as planned without the Federal permit, but was correct and reversed the conclusion and said, this does not render the otherwise independent State action a Federal action. And the difference there is that the Court also added the gloss It seems to me to be the same thing you're arguing here. No, it isn't, Your Honor, because Well, that's why I bring it up. Because in that case, the Court added the gloss that the type of interconnectedness there was not the type that means that the private action cannot proceed without the without the Federal Army Corps permit. But just a minute, their language is pretty big. Although there may be no reason to build the interconnection, if the rest of the project is not to be built, Federal jurisdiction over this small segment of the project is not control and responsibility over the rest of the project sufficient to federalize the entire project. And, again, if you continue on, this gets to the issue of independent utility. In that case, the private project was already proceeding without the Corps permit. And the Court said that there's always going to be this kind of interconnectedness in that particular kind of development project where there are a few wetlands in one place and then a larger project somewhere else. That's not the case here. Here there is an absolute inability of this private project to proceed, as the BPA itself has acknowledged in its briefing. It's also acknowledged in the ROD and in the FEIS. And that's enough to I appreciate your argument, but now relate that to the standard again. That's why I stopped my colleague's I stopped your answer to my colleague's question before you answered it. The standard is arbitrary and capricious. Arbitrary, capricious, or otherwise not in accordance with law. I understand that. And what Given what we've got here in wetlands, given what we've got here in that particular situation, given even Enos, we haven't gone through Enos, I'm trying to figure out why this is arbitrary and capricious. It's not in accordance with 40 CFR 1508.25, which says that connected actions have to be addressed in the same EIS if they cannot or will not proceed unless other actions are taken simultaneously or are interdependent parts of a larger action. That is the law that applies here that makes it obligatory to the BLM to consider the turbines and the interconnection as part of a single action and to do so in a single EIS. And that's what they did. I'd like to reserve the rest of my time if I could. Okay. Thank you. Go ahead. Good morning, Your Honors. May it please the Court, my name is Hub Adams, representing the Bonneville Power Administration. With me today is Steve O'Dell from the Oregon U.S. Attorney's Office. Today I'd like to touch on three main points that support denial of this petition, one of which, the first of which, has already been largely brought up. The first is that this case is at its core about petitioner's issues with a non-federal privately planned wind project on privately owned land that was under the exclusive siting authority and control of the state of Washington, went through an extensive state process, and was litigated up to the Washington's highest court. Bonneville's role here was exceedingly small and limited simply to... Well, it's not exceedingly small. I mean, the project, the record does seem to indicate that the connection to the Bonneville grid is like the lifeblood of this project, isn't it? I wouldn't say it's a lifeblood. It's a small in the sense, physically, it's a five acre site out of... No, I understand that nobody thinks that... Maybe the other side does, but at least let me state this as a starting point. Nobody thinks that the interconnection in and of itself has major environmental consequences. And I don't think anybody is attacking the sufficiency of the EIS in so far as it involves the environmental consequences that will come simply from the interconnection. The question is whether or not that interconnection makes this a federal project on which an EIS must be filed with respect to the whole project. I understand your position is that the EIS is okay with respect to the whole project, but let's... We don't get there unless it's a federal project. And I will agree... So how do you get past Port of Astoria? I think Port of Astoria is distinguishable on a basis of the fact that in that case, actually, the court didn't just look at a simple but-for type analysis. It actually did consider whether or not Bonneville was supplying power to this proposed aluminum plant. I believe that was the facts in that case. I believe Bonneville was actually building a transmission line to that facility. So going back to the exceedingly small role in this case, where we're just literally plugging them in, basically, by building some little facilities along an existing transmission corridor. In that case, that was a contract to supply power rather than a contract to transmit power. Does that make a difference? I think it does, Your Honor. And the fact that we're not purchasing the power, hypothetically, if we were potentially purchasing the power from this wind facility, maybe that would be a factor to consider. But I think that also brings up the broader scope of the analysis that Your Honors are recognizing in the Wetland Action Network case, where you can look at this independent utility component, but Wetland Action Network went beyond that and considered whether or not there was federal involvement, whether you had jurisdiction over the site, whether there was federal funding involved, none of which are at play here. But if I understand your colleague's argument correctly, I think he's not contesting that there's no federal involvement in the construction and development of the wind farm. He's saying that the mere fact – I may be putting words in his mouth, but let me do it – that the mere fact that the wind farm couldn't exist in the absence of the ability to interconnect to the BPA grid is what makes this a federal project. And so tell me why he's wrong. I think because the Wetland Action Network case analyzes more than just that factor in looking at whether an otherwise private, non-federal activity is federalized for the purposes of NEPA. And even in Wetland Action Network, there's a discussion about how – there's an acknowledgment that there's some interdependency between the federal and non-federal components of the project that was at issue there. And yet the court found that is at play in most places where you have some kind of federal involvement in a non-federal activity. Of course, they're coming to seek a permit. So there's something the federal agency is going to do that is probably important to that non-federal project. We've identified a number of factors to consider, and assuming that this interdependency is the only one, are there cases in which the interdependency is so large that it's federal even though none of the other factors are involved? Certainly, it seems to me Point of Astoria might be one of them, isn't it? It could be. When you have – but that wasn't only on just interdependency. It was actually real kind of enablement of – Well, because the federal action there was selling the power. And building a transmission line. Right. So that the question is what were the environmental consequences of selling the power and building – well, not just building the line, but of selling the power. Right, right. And so here the question is what's the environmental consequence of transmitting the power, isn't it? It's the actual interconnection action. Right. But it seems to me if one focuses on the environmental consequences of transmitting the power, we're not talking about what happens on the wind farm. Right. If in Astoria we're talking about the environmental consequences of selling the power, then it seems to me a direct environmental consequence of that is what happens at the aluminum plant. So if I'm following, Your Honor – That's why I think the cases are different. I actually think they are. And if you do want to look at the transmitting of the power and the impact of that, it's over existing lines. So there is no impact. I don't think anybody – see, I don't think anybody's arguing that the transmission of the power causes any additional impact. Exactly. The question is whether the fact that you're agreeing to transmit the power in effect makes you responsible for the project. And I think that brings us back to Wetland Action Network and Enos v. Marsh and cases that really are dealing with a discrete federal action that has a non-federal, private, state- or local-sided activity associated with it. And how much responsibility does the federal government need to take for that non-federal portion? Does it matter that – and this is – I think, again, I'm trying to ask you to respond to an argument that we may have cut off your colleague on. And really, it looks like it's impossible for this project to go forward or very impracticable, at least, in the absence of a BPA connection. And you did a joint EIS before. Isn't that enough to get to a federal action? Your Honor, no, I don't believe it is. I think the fact that we did the joint EIS – the state of Washington has a mini NEPA process, a SEPA, State Environmental Policy Act. They have a similar type requirement as we do to analyze environmental impacts of its proposed action. It uses the same terminology. So it made perfect sense for us and the state to work together and define a proposed action. But throughout the process, from the notice of intent through the EISs through the record of decision, we were very clear on the distinct and separate actions being taken in this case, one by the state of Washington for siting the wind facility, the other for us to granting this request for interconnection. And in addition, the no-action alternative, to the extent that is leaned on as some sort of admission, it simply isn't. It was having a no-action alternative is required under NEPA and defining it as no-build is pretty standard stuff. We didn't let your colleague get to the question of the sufficiency of the EIS, if one is required. And let me ask you a question about that because I'm sympathetic to his argument on that point. Before you do, if I could interrupt just a minute. The reason I think this question he's about to ask is significant is that it seems to me that they do not identify any NEPA defects or environmental defects in the interconnection itself, correct? Correct. That's our understanding. And they don't allege any defect in the analysis of indirect or cumulative defects associated with this limited interconnection. I believe so. In fact, the only thing that we're really about, if we're going to go to NEPA, is the wind project outside of the interconnection. Correct. Those are the— Therefore, I think Judge Hurwitz's question is important to me as well because it seems to me if you have to defend this project outside of your interconnection, how will you defend it? And so I'm making the same assumption Judge Smith is making for the moment. I may learn as I look more closely at the briefs that they have a problem with the EIS even if it is only talking about the interconnection, but I don't think so. So my question is this. If you really are responsible for EIS for the entire project, how can an EIS that just simply evaluates the current situation and no action be sufficient? Sure, Your Honor. If you're asking about the range of alternatives— It surely could be a smaller—if this really is a federal project, it surely could be a smaller wind farm. The state of Washington required that they reduce several of the turbines. So if we really are in NEPA land on the entire project, I don't see how this EIS complies. So respond to that. Yeah, so in theory, if there was no state citing authority and there was no other activity going on and we were citing this wind project, which we have no statutory authority to do, I would concede we could look at alternatives. That simply are not the facts here. In reviewing this, we need to look at it under the rule of reason. And it was reasonable in this case for the federal agency, Bonneville, to work with the state in reviewing these alternatives. I don't think the fact that you filed a joint project and worked— Okay. That one, joint EIS—I'm asking a different question. I'm asking, let's assume that you're responsible for filing an EIS for the whole project. It really doesn't do anything except say, well, the only alternative is to do nothing, and that's no good, and therefore we have to go forward with this one. That's not normally what we see in an EIS, is it? It can be. In Your Honor's opinion, in the California XREL Imperial County case, the point was well made that there's no numerical floor on the number of alternatives that need to be considered. It's what's reasonable in a pragmatic sense, given the circumstances of the case. So I think it brings it back to, granted, you know, I don't want to spend time on the joint EIS process too much, but the fact that the state was citing this, it was not unreasonable for us to take that into consideration, and if they're eliminating—the body with the authority to cite the wind project is eliminating from consideration and explaining why, throughout the record, both in its citing process and in the EIS process, why they're eliminated, and we concur with that. I think we should be mindful of it and respectful of that as well. So, again, I think in this case, it is reasonable, and there—such as the California XREL— Well, turn to mitigation. Did you discuss any mitigation measures, other than saying mitigation is going to be done to the extent feasible? We— In the EIS? We have specifics on a number of the mitigation identified in there. I don't have specific sites to those, if you're looking for those right now. But didn't we say that just listing mitigation measures isn't enough? I believe, absolutely, listing is not enough, and the agency did much more than that. There's over 100 mitigation measures identified. Some of them, most of them, rely, not surprisingly, on state or local processes, which Methow Valley v. Robertson v. Methow Valley recognize that there's only so far you have to go in fleshing out those alternatives as a federal agency or those mitigations. Let me ask the question differently. Let's assume this was entirely a BPA project. Sure. Do you think there's a sufficient assessment of the effect on birds if this were entirely a—in all your site, too, is a demographic? So now we're shifting to birds, not mitigation? Yeah, well, NEPA, you know— What's that? Part of the environment. He's gone to birds and not mitigation. Yeah, I've shifted to the birds. All right, I'm following you. So, you know, if this were an entirely federal project and the discussion of the possible effect on bird populations was the one in this EIS, I'd have a hard time thinking you took a hard look at it. Tell me why I'm wrong about that. So I can definitely tell you that. I think that there was extensive survey work done. There's not only one method that needs to be done to collect bird data. The survey work was done on-site, which distinguishes this from some other cases that have come before this court. There was specific data collected on these birds that allowed for a reasonable analysis of potential impacts. So in my mind, yes, this was indeed— there are multiple years of surveys actually spread throughout the year that covered the species that were addressed and had the potential to occur at the site. The EIS documented that, included four specialist reports as appendices describing the surveys, the methodologies, the reasonable conclusions that were drawn. So yes, and there is, as mitigation, plans for advisory committee to evaluate. I mean, the reality is often you can only do so much in advance to describe what potential impacts could occur, and then you can—something needs to happen, and then you can—as was recently done here, an adaptive management-type approach to mitigate if necessary. So if I understand, you had three arguments. One is this isn't a federal project. Second, if it is, the EIS is sufficient? Correct. What's your third argument? There was no need to prepare a supplemental EIS in this case. Well, that's really the second argument, isn't it? The existing EIS was sufficient. Well, I mean in the sense of in the information that came to light or developed subsequent to the final EIS in 2011, once petitioners here brought suit against the state of Washington on the citing process, there was a gap period while that litigation resolved itself, and then BPA then— I see. Your argument is that if this was a federal action, nothing occurred between the time you filed the EIS and the action to require supplementation of the EIS. Well— Not filed, but prepared the EIS. Well, I was going to say, regardless of whether the scope of the federal action, which we believe, again, is limited to the— Right, right. We reasonably, under our regulations, reviewed any and all information, some that we gathered ourselves as well as some brought to us by petitioners, to answer and address and make sure that did not trigger the need to do a supplemental EIS. Okay, that's—okay, now I understand. If I could, I'd like to go back to mitigation. Absolutely. It seemed to me that what you really said in your briefs was that you're conceding that the FEIS doesn't address the effectiveness of the mitigation. Do you agree? No, I don't agree with that, Your Honor. Well, I thought that's exactly what you said. I think what we kind of are—what we are saying is NEPA doesn't— That's what I want you to tell me. Why aren't you saying that? In short, NEPA does not require that evaluation of effectiveness. Was there any discussion of mediation effectiveness in the FEIS? Implicitly, and that's where I was going to get to. So I would say there's more than one way to skin a cat. You can prove effectiveness, and even if you are to agree that evaluating effectiveness is a requirement of NEPA, nothing in NEPA specifies how you do that. In the EIS, as we described in our brief, mitigation, the long— a large amount of mitigation is identified, and then for each section, for all the resources, there's a discussion of unavoidable impacts after mitigation. That approach actually was— I can understand your argument because it seems to me what you're saying is the project is yet to be built and the third parties have some responsibility for carrying out that mitigation. Correct. But I guess I don't know how that agrees with our case, which is South Fork Bond Council of Shoshone. Shoshone. The Shoshone case? Right. Correct. Which says an essential component of a reasonably complete mitigation discussion is an assessment of whether the mitigation measures can be effective. So, yes, I think there's some potentially conflicting decisions in this circuit, to be honest, Your Honor. Looking at, again, Methow Valley and what it required and what this Court followed subsequently, as well as in—let me get—Okanagan Highland Alliance v. Williams, which recognized that a decision by this Court had been overturned by the Supreme Court on requiring a showing of effectiveness. But nonetheless, there is the Shoshone case a decade-plus later that comes up. So I think our position is there's a logical and reasonable basis for saying mitigation effectiveness doesn't— So you're saying our per curiam decision in 2009 is somehow undone? I would not say undone, Your Honor. I would say there is some prior precedent which seems to conflict with it. Every time somebody tells me, but I can quote this prior precedent, I don't know how that works. If I have thereafter said something that says as effectively as this says it, you've got to tell me about proposed mitigation measures and the effectiveness thereof, and it's the last case out why you didn't do it. I fully understand your point, Your Honor. And I think, again, we're raising that point that the Supreme Court has made that statement about effectiveness. But nonetheless, the structure of the EIS does provide for that evaluation of effectiveness of mitigation by identifying what's unavoidable. And that was exactly the approach taken in Laguna Greenbelt, cited in our briefs as well, where the Court looked to that acknowledgement that there would be unavoidable impacts, even after mitigation, as a form of showing an evaluation of the effectiveness of mitigation. So it's enough to say the impacts will be unavoidable to excuse you from discussing ways to mitigate the impacts? No, Your Honor. I think the point is that the EIS identifies impacts, identifies, then identifies mitigation, and then basically is talking about residual unavoidable impacts, not saying everything's unavoidable, but it specifically identifies certain impacts that would be remaining, even if you do the mitigation, which effectively is describing effectiveness. And, again, upheld by this Court in Laguna Greenbelt. Oh, I see. So what you're saying is by identifying what you can't fix, you've demonstrated the effectiveness of what you can fix. Correct. Again, Laguna Greenbelt, I point you to that case of upholding a similar type structure. I see I'm almost out of time. That's what I thought you were saying. I'm not sure I agree, but I understand. I see I am out of time. If there's any further questions. Judge Fisher, do you have any questions? No. I've been following the argument with great interest. All right. Thank you. Thank you, Your Honors. Your Honors, I'd like to cite two cases that I think may make the point better, even than the Port of Astoria v. Hodel case. The earlier case cited in that case, Sierra Club v. Hodel, involved another private plant, and the Court in that case, BPA, had contracted to provide private land to the power, but without which the plant couldn't operate, and by doing so, by agreeing to supply the transmission, it so federalized the entire project that it became major federal action. That's why I asked before, and so I think it's important. I'd like to hear your response to this. It seems to me that when a federal agency provides power to a private entity, one of the environmental effects of providing that power needs to be considered by the federal agency, and that's Port of Astoria, and that's the previous case that Port of Astoria cites. Is the same thing true when the federal agency agrees to transmit power from the private entity? In other words, I don't think any of us think there's an environmental effect from the transmission, so is the federal agency also responsible for the environmental effects of the operation of the private entity under those circumstances? From ANIPA's standpoint, yes. And it's because of the independent utility test that this Court has held, and it's because of the requirement in 40 CFR 1508.25 of evaluating connected actions or actions that are all part of a single action as they are here in a single EIS. The Federal Government becomes responsible for evaluating the impacts of those private activities when they cannot exist independent of the others. The Laguna Greenbelt case is another good one where there was only a federal interchange off of I-5, but the entire project, even though most of the roadway was private, had to be considered in the same EIS. And I see that I'm out of time. Thank you. Thank you. We appreciate both arguments. The case will now be submitted, Case 1572788. And we will turn to the last case. Would you like a break? Can we take a short break? We can. And we will take a short break. Thank you very much.
judges: Fisher, N.R. Smith, Hurwitz